Filed 7/21/26  P. v. Pantoja CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>OSCAR PANTOJA,<br><br>  Defendant and Appellant. | B338001<br><br>(Los Angeles County<br>Super. Ct. No. PA075242) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge.  Affirmed in part, reversed in part and remanded.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Oscar Pantoja (defendant) appeals from his conviction of two counts of attempted murder where the People advanced the kill zone theory to support his guilt. Defendant contends use of the kill zone instruction was factually unsupported and should not have been given and the court's instruction identified a primary target not supported by the evidence; he adds, the prosecutor's argument compounded these errors such that there is a reasonable likelihood the jury relied on a legally impermissible theory to convict. We agree and reverse counts 3 and 4.

Defendant also alleges the court abused its discretion in imposing the middle term on counts 5 and 7. We disagree.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Statement of the case

In 2024, the People filed a second amended information against defendant alleging one count of murder (Pen. Code,[1] § 187, subd. (a); count 1); three counts of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664; counts 2–4); being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 5); and shooting at an inhabited dwelling while personally using a firearm (§§ 246, 12022.5, subd. (a); count 7). As to counts 1 through 4, the People also alleged defendant personally used and discharged a firearm as defined in section 12022.53, subdivisions (b), (c), and (d). The People further alleged defendant suffered a prior strike conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12).

The jury convicted defendant as charged and found the murder in count 1 was in the first degree. In a bifurcated court

---

[1]    All further undesignated statutory references are to the Penal Code.

trial on the prior strike allegation, the court found the strike true. The court sentenced defendant to state prison for an aggregate term of 186 years to life, which included imposition of the middle term on counts 5 and 7.

Defendant timely filed a notice of appeal.

## II.   Statement of facts

### A.   *Background*

Thomas Pineda joined the North Hollywood Boyz street gang in approximately 2005. Louis Villegas joined the gang after Pineda, and both were active members. Defendant, known as "Shadow," and Andrew Salas also joined the gang after Pineda.

By early 2010, Pineda had grown tired of the gang lifestyle. After being released from probation, he decided to disassociate from the gang, found work, and stopped attending gang gatherings. Villegas similarly withdrew from the gang, found employment, purchased a car, and began dating Jocelyn Solano. Pineda and Villegas remained in contact and spent more time together after leaving the gang.

Defendant was particularly upset by Pineda's decision to leave the gang. He called Pineda's house repeatedly, asking where Pineda was and why he was hiding, and sometimes came to the house looking for him. The conflict between defendant and Pineda escalated into mutual disrespect of each other's families. Defendant told Pineda that Pineda's family knew what they had coming if they ran into defendant and the gang. Pineda responded by disrespecting defendant's daughter. Pineda understood that he should "watch [his] back" and, if he and defendant ever saw each other, violence would ensue.

The gang members often gathered at the home of Rachel Cordero, who had a daughter, Melania. On one occasion around 2009, the gang was at a hotel. Melania later told Pineda she had

3

awakened with the feeling that Villegas had done something inappropriate to her. As a result, Melania told Pineda he should not associate with Villegas and "she wanted him dead." Pineda thought it was a "moment of anger" because they had all been friends and he did not want to take sides. Eventually, Salas became romantically involved with Melania's mother, Cordero. In September 2012, Melania remained upset about Villegas and continued to express it to Pineda and others in the gang.

### B. *The events leading to the shooting*

On the evening of September 24, 2012, Catarina Strickler invited Villegas and Solano to her house. The group decided to go to the D Lounge bar to celebrate Villegas's new job and car. Villegas picked up Pineda to join them. Villegas drove the group in his Lexus sedan, with Solano in the front passenger seat, Pineda in the rear seat behind Solano, and Strickler in the rear seat on the driver's side.

Surveillance video from a liquor store captured defendant and Salas inside the store around 9:00 that evening. Defendant was wearing a black T-shirt, and Salas wore a white T-shirt and baseball cap. After leaving the liquor store, the two men drove to the D Lounge, arriving only minutes after Pineda and his group left. Defendant and Salas left the D Lounge minutes later.

Before the group left the D Lounge, Villegas received a phone call. After the call, Villegas told Pineda that defendant wanted to meet up to resolve the differences between defendant and Pineda. The group left the bar and went through a nearby drive-through where Villegas received a second call. Strickler saw the phone's caller ID display the name "Shadow." Solano took the phone from Villegas and spoke aggressively to the caller in Spanish. Pineda understood the purpose of the calls was to arrange a meetup between defendant and himself to settle their differences. Pineda

4

believed only defendant would be present and the two would engage in a "fair one-on-one fight."

C.     *The shooting*

Villegas drove to the intersection of Balboa Boulevard and Parthenia Street and parked the Lexus on Parthenia Street facing west, at the corner of Nottingham Place.  The passenger side of the Lexus was adjacent to the sidewalk.  A Honda was parked nearby on Nottingham Place, facing south toward Parthenia.

Pineda told Strickler to stay in the car and he and Villegas got out and walked toward the rear of the Lexus and in the direction of Nottingham Place and the Honda.  Strickler repositioned herself in the back seat so she could see out both the front and back windows by turning her body toward the passenger side of the car with her legs across the backseat and her back against the rear driver's side door.  She saw defendant, whom she recognized as "Shadow," exit from the driver's side of the Honda and a second man, whom she saw wearing a white T-shirt and baseball cap, exit from the passenger side.  She thought there was going to be a fist fight among the four men.

Defendant and the second man walked toward Pineda and Villegas.  As the two pairs got closer to each other, defendant and the second man drew firearms from their waistbands.  Strickler saw both men point their guns at Villegas and Pineda.  Pineda saw defendant's gun pointed at him and saw the flash from the gun firing.  Villegas and Pineda put their hands up and tried to run back toward the Lexus.

Pineda turned and ran toward the rear driver's side of the Lexus and heard more shots fired.  He was struck in the back by a bullet near the rear driver's side door and lost consciousness as he fell to the ground.  He did not know who shot him in the back but told police defendant was the man who was "going for" him.  As

Pineda ran toward the driver's side of the Lexus, Villegas ran toward the front of the Lexus along the passenger side. When Pineda regained consciousness, he was at the rear driver's side of the Lexus with his head toward the front end of the car, and he saw Villegas face down on the ground in front of him.

Strickler heard two or three gunshots but could not identify who fired them. The gunshots stopped. The man in the white T-shirt approached the front passenger door of the Lexus, which was open, and shot Solano. He stepped to the side to face the rear passenger door and shot Strickler. Strickler was struck in the abdomen and grazed in the knee. Solano was shot once through her forearm and once through her chest. The man in the white T-shirt ran back to the Honda, and the car drove away. Strickler did not see defendant approach or come near the Lexus at any point during the shooting.

Eyewitness Henry Kim was stopped at a red light at Balboa Boulevard and Parthenia Street when he heard gunshots, saw two muzzle flashes, and observed a man in a white T-shirt, dark shorts, and a baseball cap running away from the scene.

Strickler exited the Lexus from the rear passenger door. She found Pineda's phone, which already had 911 dialed; Strickler completed the call to 911. Strickler saw both Pineda and Villegas on the ground on the driver's side of the car.

D. *Ballistics evidence*

Los Angeles Police Department Detective Stefanie Diaz investigated the case and testified regarding the ballistics evidence. The physical evidence established that a total of 10 bullets were fired, producing nine to 13 impacts including through-and-through wounds. Six 9-millimeter cartridge casings were recovered from the scene, all discharged from the same semiautomatic firearm. Four casings were recovered from the sidewalk adjacent to the passenger

6

side of the Lexus, consistent with a shooter firing into the Lexus from that location. No cartridge casings were found along the path where a second shooter, presumably defendant, was firing at Pineda as he fled south and southwest toward the driver's side of the Lexus.[2]

Three bullets struck property across the street from the Lexus: one struck a minivan parked on Parthenia Street, consistent with a trajectory traveling north to south; one penetrated a sliding glass door of an apartment across Parthenia Street, also consistent with traveling north to south; and one struck a sedan parked nearly directly across the street from the Lexus, consistent with traveling southwest. Detective Diaz testified the impact evidence from those three locations was consistent with the second shooter firing at Pineda as he fled toward the driver's side of the Lexus.

The full accounting of the 10 bullets fired was: Solano struck twice while inside the Lexus; Strickler struck in the abdomen while sitting in the Lexus and the bullet remains in her body; a bullet through the rear passenger window; Pineda struck once in the back; Villegas struck twice; and three bullets striking the minivan, apartment, and sedan across the street from the Lexus.

William Moore, an independent forensic scientist specializing in firearms and a former Los Angeles Police Department firearms analyst, testified for the defense. Moore opined only one firearm was used and it was a semiautomatic nine-millimeter.

On rebuttal, Detective Diaz testified that bullet fragments recovered near the vehicles and apartment across the street from the Lexus were consistent with small caliber bullets that could include .38 special, .357 Magnum, or nine-millimeter calibers and

---

[2]     This was consistent with the second shooter using a revolver, which does not automatically eject casings.

were most likely fired from a revolver because no casings were recovered. She further testified the bullet recovered from Pineda was consistent with revolver calibers and that it is not possible to determine whether a bullet was fired from a particular firearm without having the firearm available for testing.

### E. *Defense witness Salas*

Salas, who was tried and convicted separately for his role in these crimes, testified at defendant's trial to take accountability and clear his conscience. At the time of the investigation and his trial, Salas blamed defendant for the shooting because he knew defendant had fled to Mexico and "thought [he (Salas)] could get away with this."

Earlier on the night of the shooting, Salas went to defendant's house. Defendant told Salas he was going to meet up with Pineda because of their ongoing family disputes. Defendant appeared angry and said he wanted to hurt Pineda, who had threatened to harm defendant's daughter. Salas accompanied defendant for support.

During the drive, Salas overheard defendant's phone calls and heard Solano's voice on one of them. When Salas learned Villegas would be present with Pineda, Salas also became angry as he recalled Melania's allegations against Villegas. Salas independently decided he would shoot Pineda, Villegas, and Solano, whom he planned to kill because she would be a witness. Salas did not inform defendant of his plan to kill the three. Salas was carrying a loaded nine-millimeter semiautomatic firearm in his front pants pocket. As far as Salas knew, defendant was not carrying a gun and planned only to fight Pineda.

At the scene, after defendant and Salas exited the Honda, Salas separated from defendant and moved along the sidewalk toward the passenger side of the Lexus, intending to shoot Pineda

8

and Villegas. He went to the front passenger door of the Lexus and shot Solano twice through the open window. He then saw Strickler in the rear passenger seat and, though he did not know her, decided to shoot her to eliminate her as a witness. He fired once through the closed rear passenger window. During this time, Salas did not hear any other gunshots, yelling, or screaming, and did not know what was happening around him.

Salas then turned to his left toward Pineda, who was standing near the trunk of the Lexus, and fired two or three times as Pineda tried to run away. When he saw Villegas near the rear of the Lexus on the driver's side, Salas shot him twice, emptying his gun. Salas told defendant they needed to leave, and they drove away.

## DISCUSSION

### I. Kill zone instruction

#### A. *Relevant authority*

##### 1. *Attempted murder*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).) As our Supreme Court explained in *People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*): "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim."

##### 2. *Aiding and abetting attempted murder*

To be guilty of attempted murder under an aiding and abetting theory, the defendant "'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must]

9

give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.'" (*People v. Lee* (2003) 31 Cal.4th 613, 624, superseded by statute on other grounds as stated in *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823–824.)  In short, to be guilty of attempted murder as an aider and abettor, the defendant must intend to kill. (*Lee, supra*, at p. 624; *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

### 3. *Kill zone doctrine*

The Supreme Court has "expressly embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales, supra*, 7 Cal.5th at p. 602.)  This concurrent intent theory is referred to as the "'kill zone.'" (*Id.* at p. 603.)

Under the kill zone theory, "a defendant may be convicted of the attempted murder of an individual who was not the defendant's primary target." (*Canizales, supra*, 7 Cal.5th at p. 596.)  "The kill zone theory permits a jury to infer a defendant's intent to kill an alleged attempted murder victim from circumstantial evidence (the circumstances of the defendant's attack on a primary target)." (*Id.* at p. 597; see *People v. Mumin* (2023) 15 Cal.5th 176, 193 (*Mumin*).)

The kill zone theory "may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales, supra*, 7 Cal.5th at p. 607.)  Relevant factors in determining whether defendant

10

intended to create a kill zone are (1) number of shots fired, (2) nature of the zoned area, (3) distance between primary target and others, (4) distance between defendant and others, (5) type of weapon used, and (6) whether anyone was hit. (*Ibid*.)

Our inquiry on appeal is "whether substantial evidence [was] presented to support a reasonable inference by the jury 'that defendant[ ] intended to create a zone of fatal harm around a primary target.'" (*Mumin, supra*, 15 Cal.5th at p. 203.) Justification for instructing on the kill zone theory "requires substantial evidence that: 1. the defendant intended to kill a primary target; 2. he concurrently intended to achieve that goal by killing all others in the fatal zone he creates; and 3. the alleged attempted murder victim was in that zone." (*Ibid*.) These requirements must be strictly adhered to in order to "protect against an improper attempted murder conviction based only on a conscious disregard for life" (*ibid*.) because "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk'" (*Canizales, supra,* 7 Cal.5th at p. 607).

Because "use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction," "trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, *we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate*." (*Canizales, supra*, 7 Cal.5th at p. 608, italics added.)

**B.** *Relevant facts*

    **1.** *Jury instructions*

The jury was instructed using CALCRIM Nos. 400 and 401, regarding general principles of aiding and abetting and aiding and abetting intended crimes, respectively. The jury was also

11

instructed with CALCRIM No. 600 regarding attempted murder and the kill zone doctrine. When instructing about the kill zone, the court stated: "A person may intend to kill a primary target and also secondary targets within a zone of fatal harm or 'kill zone.'" The jury was told "[i]n order to convict the defendant of the attempted murder of Thomas Pineda, Jocelyn Solano, and Catarina Strickler, the People must prove that the defendant not only intended to kill *Louis Villegas* but also either intended to kill Thomas Pineda, Jocelyn Solano, and Catarina Strickler, or intended to kill everyone within the kill zone. [¶] In determining whether the defendant intended to kill Thomas Pineda, Jocelyn Solano, and Catarina Strickler, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) Thomas Pineda, Jocelyn Solano, and Catarina Strickler was [*sic*] located within the kill zone." (Italics added.) The court listed the factors to consider in determining whether defendant intended to create a kill zone, including: "[t]he distance between the defendant and Thomas Pineda, Jocelyn Solano, and Catarina Strickler; [¶] [and] [t]he distance between Thomas Pineda, Jocelyn Solano, and Catarina Strickler and the primary target [listed as Villegas]." Finally, it instructed, "If you have a reasonable doubt whether the defendant intended to kill Thomas Pineda, Jocelyn Solano, and Catarina Strickler or intended to kill *Louis Villegas* by killing everyone in the kill zone, then you must find the defendant not guilty of attempted murder of Thomas Pineda, Jocelyn Solano, and Catarina Strickler." (Italics added.)

The jury was also instructed using CALRIM No. 200, which, in relevant part, instructed, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the

12

attorneys' comments on the law conflict with my instructions, you must follow my instructions."

### 2. *Prosecutor's argument*

The People argued two theories of liability for counts 3 and 4, aiding and abetting and concurrent intent or "kill zone." The prosecutor argued:

"So let's talk about the attempted murder. That applies to Thomas Pineda, Catarina Strickler and … Jocelyn Solano[.] [¶] … [¶] Now there are several theories. So we know … there w[ere] four victims, two shooters. A lot of movement going on with the shooters in pursuit of intended primary targets. And some of it, just like I mentioned, when you are aiding and abetting, sometimes you can be the perpetrator, sometimes you can be the aider and abettor. And sometimes those roles can switch as you are committing a crime taking out numerous victims. [¶] And the example I think I left you with during voir dire was the bank … robbery example as aiding and abetting. Remember, you had the guy planning[,] … the guy who got the gun, … the driver … [and] you had the robber themselves. And they were to commit a robbery. [¶] All those other individuals who weren't in the bank … [but] helped facilitate that robbery can be guilty of aiding and abetting for that bank robbery. [¶] But let's say the example I gave you was you have the robber with the gun, the driver, and let's say they hit one bank. And then they decide to switch roles going to a second bank. [¶] You understand what I am saying? [¶] All right. Obviously, the evidence tends to prove that Oscar Pantoja shot Thomas Pineda …. [¶] … [¶] So, again, attempted murder, you have a primary target, *Thomas Pineda.* Secondary target—keep in mind how this unfolds. This is very dynamic. [¶] Again, and I will say, all these counts you can find aiding and abetting, with the exception, maybe, of Thomas Pineda, where [defendant] was the

13

perpetrator…. [¶] Let me finish out this out, because you can go with either one of these. [¶] With the secondary targets, when they first come out of the car, keep in mind who their intended targets were. Right in front of them is Thomas Pineda, where Oscar Pantoja leveled his firearm and barrel onto. And standing next to Thomas was Louis Villegas. [¶] So in that moment, as he is pulling his gun out, right next to Thomas is Louis. So *there's what's known as a kill zone, because you are in close proximity to your intended target, so you become a secondary target to your primary target because you are close to that primary target.* So when they first jump out, Louis would have fallen within that kill zone. [¶] And then Catarina—keep in mind, *Oscar Pantoja is now moving towards the Lexus in pursuit of his primary target, firing at his intended target. Now he is bringing his fire closer to the Lexus and the occupants of the Lexus.* That would include Catarina and Jocelyn. [¶] And then, like I said, aiding and abetting applies to these counts as well. [¶] This just sort of illustrates how that would play out on that aerial thing [(presumably referring to one of the aerial maps)]. [¶] This could apply if those victims were not shot. You understand? … [¶] But, again, you have these victims shot by Andrew Salas and you have the aiding and abetting theory as it relates to those other additional counts. *And that's where the kill zone would shift. It's not a static thing, particularly if the shooter is moving and shooting. That kill zone changes as he changes his orientation of fire.*" (Italics added.)

The prosecutor tried again to discuss aiding and abetting by reiterating CALCRIM No. 400 and returned to the robbery example, "where the driver and robber can switch roles." Then he explained the role defendant played in planning and arranging the meeting with Pineda and driving to the location and argued "defendant's

14

words or conduct did, in fact, aid and abet the perpetrator's commission of the crime"

### 3. *Jury's question*

During deliberations, the jury asked for the definition of "the kill zone" and "surrounding area/proximity." Relevant here, the court stated: "The application of the 'kill zone' theory does not apply if the defendant had the intent to kill the victims named in the attempted murder counts. As stated in CALCRIM 600, to convict the defendant of the attempted murder of Thomas Pineda, Jocelyn Solano, and Catarina Strickler, <u>the People must prove that the defendant not only intended to kill Louis Villegas but also either intended to kill Thomas Pineda, Jocelyn Solano, and Catarina Strickler, or intended to kill everyone within the kill zone</u>." (Original italics and underscoring.)

Regarding the request to define surrounding area and proximity, the court instructed: "As stated in CALCRIM 200, some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

## C. *Analysis*

### 1. *The kill zone instruction was not supported by substantial evidence because the women were not secondary targets*

Fundamental to the kill zone theory is a particular relationship between the primary target, the means of the attack, and the secondary target. (See *Mumin, supra*, 15 Cal.5th at p. 203.) Specifically, the would-be secondary targets (here, Solano and Strickler) must be endangered not because they were specifically targeted by defendant or Salas, but because "'defendant has a

15

primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.'" (*Canizales, supra*, 7 Cal.5th at p. 607.)

The evidence at trial established Salas approached the passenger side of the Lexus and deliberately shot the women. His stated motive was to eliminate witnesses. Strickler and Salas both testified that Salas stood near the front passenger door and fired twice at Solano before stepping to the side and shooting Strickler. Four shell casings from a semiautomatic firearm were found on the passenger side of the Lexus. This is also consistent with Strickler's and Salas's testimony that Salas shot into the Lexus four times and Salas's testimony regarding his use of a semiautomatic firearm.

Because the evidence established that Strickler and Solano were Salas's primary targets, the kill zone doctrine, which addresses attempted murder liability for secondary targets, has no application.

2. *The kill zone instruction was not supported by substantial evidence because defendant's actions did not create a kill zone encompassing Strickler or Solano*

Evaluation of the factors from *Canizales* demonstrates the evidence also does not support use of the kill zone theory based on defendant's own conduct. Defendant shot at Pineda four times using a revolver. Defendant was not firing in the direction of the Lexus. Instead, the evidence established defendant was firing in a south/southwest direction as he chased Pineda, and the Lexus was west of defendant. More importantly, nothing about the specifics of his attack—use of a revolver, small caliber ammunition, four shots fired in an open street with no one else around—demonstrates defendant intended to create a zone of fatal harm around Pineda or,

16

even if he did, that the zone could reasonably extend to the Lexus and its occupants.  (See *Canizales, supra*, 7 Cal.5th at p. 607.)

At best, the evidence supports an inference defendant acted with conscious disregard for the safety of others in the vicinity.  As the Court stated in *Mumin*, "though [the secondary target] was placed in harm's way, a concurrent intent instruction would only have been warranted if defendant acted not with a mere conscious disregard for life but with a specific intent to kill."  (*Mumin, supra*, 15 Cal.5th at p. 204.)  We have no evidence of such specific intent by defendant.

**3.**     *The court's instruction misidentified defendant's primary target*

As discussed, substantial evidence did not support administering a kill zone instruction.  This error was compounded by the court's misidentification of the primary target.  CALCRIM No. 600 as read to the jury incorrectly identified Villegas as defendant's primary target and listed Pineda, Solano, and Strickler as the secondary targets located in the kill zone.  However, the evidence at trial consistently and overwhelmingly established Pineda was defendant's primary target.

The conflict between Pineda and defendant as a result of Pineda leaving the gang was escalating.  The conflict included defendant repeatedly calling Pineda's home and mutual disrespect between the two men.  Pineda understood violence would ensue if he was to see defendant again and that he needed to "watch [his] back."  The evening of the shooting, phone calls between defendant and Villegas were for the purpose of arranging a meetup for defendant and Pineda to settle their "beef" through a fist fight.  At the time of the shooting, defendant pursued Pineda and shot him.

Respondent asserts no error by the court because, just as defendant was angry at Pineda for leaving the gang, "a reasonable

17

inference was that [defendant] was also upset with Villegas for Villegas 'defecting' from the gang, and he had the intent to kill Villegas for doing so" and because defendant spoke to Villegas in arranging the meetup that evening. In a footnote, respondent concedes "[t]here also was evidence that [defendant] intended to kill Pineda" over their existing conflict, but asserts defendant "intended to kill *both* men" and argues "intent to kill *both* Pineda and Villegas did not mean there was insufficient evidence to support the kill zone instruction [identifying Villegas as the primary target]." Not so. There was no evidence of an ongoing "beef" between defendant and Villegas or of defendant's intent to harm, let alone kill, Villegas. Moreover, there was no evidence defendant pursued Villegas at the time of the shooting.

On the other hand, the evidence established Salas was angry at Villegas and wanted to kill him. Melania, his girlfriend's daughter and long-time friend, accused Villegas of sexually assaulting her some years earlier. The evidence also established Salas, not defendant, pursued and shot Villegas. Thus, by identifying Villegas as defendant's primary target, the instruction asked the jury to evaluate kill zone liability through a factual premise directly contradicted by the record.

This error was not merely technical. "[E]xistence and location of a primary target is important because those facts help define the extent of the kill zone, which is necessary in order for the jury to determine whether the secondary target was within that zone." (*Mumin, supra*, 15 Cal.5th at p. 209.) Thus, a juror attempting to conscientiously follow the instruction as given would have been working from a false foundation, asking whether Strickler and Solano were within a zone of fatal harm created by defendant around Villegas, when the evidence established that Villegas was Salas's target and defendant was pursuing Pineda.

18

### 4. *The court's response to the jury's questions further compounded the errors*

The court's response to the jury's inquiry about the kill zone and proximity created more issues. It erroneously reinforced Villegas as the primary target and provided no meaningful guidance on how the jury was to deal with the idea of "proximity" in terms of the creation of a kill zone. It also introduced a confusing framework for determining guilt for this nonshooter defendant. The court told the jury, "The application of the 'kill zone' theory *does not apply if the defendant had the intent to kill the victims named in the attempted murder counts*" but went on to instruct, to convict defendant of the attempted murders of the named victims using kill zone, the People must prove that he intended to kill Villegas and also either *intended to kill the three named* victims *or* intended to kill everyone in the kill zone. (Italics added.)

While this description is legally correct to the extent that any path to attempted murder liability for defendant had to include an intent to kill each victim, it created a confusing circular path for the jury. If they found defendant had the intent to kill the named victims, they were instructed kill zone did not apply. However, in the event they decided the kill zone *did* apply, defendant must have intended to kill the named victims or create a kill zone. Moreover, if the jury decided the kill zone theory did not apply because defendant had the intent to kill the named victims, the instruction gave the jury no guidance on where to go next. Of course, the only other theory of liability for this nonshooter defendant would have been aiding and abetting, but, as explained *post*, because the prosecutor's argument failed to fully develop that theory and wove its explanation into the discussions about kill zone, the jury likely did not understand the difference.

19

The court's response to the jury's questions reinforced the factual error that Villegas was defendant's primary target and introduced new analytical challenges for the jury. As we now discuss, these errors were aggravated by the prosecutor's closing argument, which identified a different primary target and misdescribed the legal standard in ways that left the jury without a legally sound, coherent framework for properly applying the kill zone theory.

**5.** *The prosecutor's explanation of the kill zone compounded the instructional errors*

The prosecutor's closing argument aggravated the errors identified, *ante*. This was done in three distinct and significant ways.

First, there was a direct contradiction between the prosecutor's argument pointing to Pineda as defendant's primary target and the court's instruction, identifying Villegas as defendant's primary target. These two theories of kill zone liability cannot be reconciled. The court asked the jury to find defendant intended to kill Villegas and created a zone of fatal harm around him. The People's argument asked the jury to find defendant intended to kill Pineda and created a kill zone that first included Villegas and then shifted to encompass the women in the Lexus as he pursued Pineda.[3] Once Pineda and Villegas ran from the two

---

[3] We note, the evidence strongly suggests the women in the Lexus were never in the path of defendant's fire. The Lexus was to defendant's right (west) as he shot at Pineda in front of him (south). Three bullets struck property across the street from the Lexus: one struck a minivan parked across the street on Parthenia Street, consistent with a trajectory traveling north to south; one penetrated a sliding glass door of an apartment, also consistent with traveling north to south; and one struck a sedan parked nearly directly across the street from the Lexus, with a southwest direction of travel.

20

armed men they went in separate directions and each was pursued by their shooter. Pineda and Villegas could not have both been defendant's primary targets. "When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, … evidence of a primary target is required." (*Canizales, supra*, 7 Cal.5th at p. 608.) Failure to identify a primary target makes defining the zone of fatal harm impossible.

Next, the prosecutor told the jury: "So there's what's known as a kill zone, because you are in close proximity to your intended target, so you become a secondary target to your primary target because you are close to that primary target."

This is a legally incorrect standard. *Canizales* is clear, "Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory. [T]he kill zone theory does not apply where 'the defendant merely subjected persons *near the primary target* to lethal risk.'" (*Canizales, supra*, 7 Cal.5th at p. 607, italics added & citation omitted.) The prosecutor's definition, proximity to the primary target equals member of the kill zone, is precisely the implied malice standard *Canizales* held insufficient. As noted by *Canizales*, the definition offered by the prosecutor "was significantly broader than a proper understanding of the theory permits. Indeed, it essentially equated attempted murder with implied malice murder." (*Id.* at p. 614.)

Respondent argues the court used CALCRIM No. 200, which instructed the jury that, in the event they found conflict between the court's instructions and the attorneys' commentary, they were to follow the law as explained by the court. This is true, and the instruction is capable of curing many misstatements by the

21

attorneys, however, the prosecutor's arguments created more than one issue and, as discussed, some of the court's instructions were not supported by substantial evidence and created further confusion.

Last, the prosecutor argued, as the shooting took place the kill zone "shifted" as defendant chased Pineda and brought his fire "closer to the Lexus and the occupants of the Lexus," thus bringing Strickler and Solano inside the kill zone. The prosecutor explained further, the kill zone is "not a static thing, particularly if the shooter is moving and shooting," explaining the zone "changes as [defendant] changes his orientation of fire."

We have found no authority to support the idea of a moving or shifting kill zone. Instead, such a theory contradicts established authority, which defines the kill zone as a bounded area of fatal harm created by a particular method of attack on a primary target, not as a roving zone that tracks wherever the shooter happens to point his weapon. Under the theory advanced by the People at trial, a defendant could be held liable for the attempted murder of anyone who happened to be near the trajectory of his fire at any moment during an active pursuit of the primary target, regardless of whether the method of his attack created a reasonable inference that the defendant intended to create a zone of fatal harm. Again, this is more properly described as pursuing the primary target with a conscious disregard for the safety of those who may be nearby. The court in *Mumin* found a similar prosecutorial description failed because it "described an amorphous area" untethered to the primary target and the defined scope of the zone. (*Mumin, supra*, 15 Cal.5th at p. 210.)

The prosecutor's misstatements of the kill zone are illustrated by his treatment of eyewitness Kim. During closing argument, the prosecutor told the jury that Kim, who was sitting at the red light

22

at an intersection southeast of the shooting, was "sort of like in that kill zone, if you want to call it that, or lethal zone of fire." Kim was a bystander, entirely uninvolved in the shooting events taking place and was also in a location opposite the direction of defendant's pursuit and gunfire.

That the prosecutor would characterize a motorist stopped at a red light as being within the kill zone confirms his argument concerning the theory bore no relationship to the legal framework of *Canizales* and *Mumin*. It bears repeating, Kim and others similarly situated were individuals to which defendant consciously disregarded the risk of harm.

> **6.** *Respondent's theory of liability is untenable*

On appeal, respondent asks this court to consider the combined conduct of defendant and Salas in evaluating whether substantial evidence supported the kill zone instruction. This argument fails.

Respondent points to *Bland, supra*, 28 Cal.4th 313, *People v. Windfield* (2021) 59 Cal.App.5th 496 (*Windfield)* and *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*) to support this point. *Bland, Windfield*, and *Vang* do not support respondent's position. Though each case involved two shooters, that is where the similarities end. The kill zone findings in those cases rested on the method of attack, such that the shooters' single unified attack created lethal danger for everyone within the zone of fatal harm. The method of attack allowed the factfinder to infer each shooter intended to kill everyone in the kill zone in order to kill their primary target.

In *Bland*, a number of rounds by two shooters into the same confined space—a car—at a single target cluster (*Bland, supra*, 28 Cal.4th at p. 318) "virtually compelled" a finding that the defendant concurrently intended to kill the passengers (the secondary targets) of the car (*id.* at p. 333). In *Windfield*, the primary and secondary

23

targets were walking "shoulder to shoulder" (*Windfield, supra*, 59 Cal.App.5th at p. 505) down the street, and the two shooters fired a "hail of bullets" (*id.* at p. 519) at them with semiautomatic guns, and, at one point, the secondary target even placed himself between the shooters and the primary target, acting as a "shield" (*id.* at p. 518). The court found, "when another person is standing very close to the targeted victim, or has placed himself between the shooters and the targeted victim, … we cannot imagine a more appropriate application of the kill zone theory …." (*Ibid.*) Finally, in *Vang*, the nature of the attack—use of military-grade, wall-piercing automatic weapons used to fire scores of bullets across the entire front of an enclosed, inhabited structure—led to finding each defendant intended "to kill every living being within the residences they shot up." (*Vang, supra*, 87 Cal.App.4th at p. 564.)

In each case, the fact that there were two shooters was incidental to the kill zone finding. Instead, it was the cohesive attack on a primary target in one defined space, as well as the nature of the attack that made it reasonable to infer the defendant(s) intended to kill everyone within that space. As discussed, we have no such attack here. Respondent offers no authority to support finding that 10 shots by two shooters fired in different directions directly at four victims collectively constituted a kill zone and our search reveals none.

Instead, the kill zone doctrine asks what *this* defendant did, intended, and created. *Canizales* frames every element of the inquiry in individualized terms, asking whether "the circumstances of *the defendant's* attack on a primary target, including the type and extent of force *the defendant* used, are such that the only reasonable inference is that *the defendant* intended to create a zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at p. 607, italics added.)

24

This individualized inquiry is not incidental. It demonstrates the foundational principle of attempted murder: "The defendant's mental state must be examined as to each alleged attempted murder victim." (*Bland, supra*, 28 Cal.4th at p. 328.) A kill zone allows a factfinder to infer a specific defendant's intent from the nature and scope of that defendant's attack. Neither *Canizales* nor any of the cases offered by respondent contains any language suggesting that a reviewing court may aggregate the shots of multiple defendants who were firing at different intended victims in different locations to construct a collective kill zone that neither defendant individually created. Extending the doctrine in this manner would require reading language that does not exist into opinions that carefully define the theory's scope. Furthermore, such a theory would dissolve the required mental state for attempted murder under the kill zone theory. As discussed, kill zone liability rests on an inference about what a particular defendant intended. That intent must be specific to the defendant. (See *Canizales, supra*, 7 Cal.5th at p. 607.)

Here, the evidence established defendant intended to kill Pineda; Salas intended to kill Villegas; and, separately, Salas intended to kill Solano and Strickler, as potential witnesses. Aggregating defendant's and Salas's *separate* shootings to satisfy the intent requirements of the kill zone would allow liability for attempted murder without proof that defendant harbored the specific intent to kill Strickler or Solano.

### 7. *Prejudice*

The errors identified *ante*—the factually unsupported instruction, the instruction's misidentification of the primary target, the court's response to the jury's kill zone and proximity questions, the direct contradiction between the court's instruction and the People's arguments, and the prosecutor's explanation and

25

argument regarding a kill zone—cumulatively establish that reversal is required.

### a. Prejudice standard

"When a jury has been instructed on both proper and improper theories for conviction, the appropriate standard of prejudice turns on the type of error involved.  If the improper theory 'is incorrect only because the evidence does not support it' [citation], reversal is not required if 'a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground' [citation]." (*Mumin, supra*, 15 Cal.5th at p. 207, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130.)  This type of factually inadequate theory is an error of state law subject to the harmless error standard provided for in *People v. Watson* (1956) 46 Cal.2d 818, 836–837 (*Watson*).  (*Mumin, supra*, at p. 207.)

"By contrast, a legally inadequate theory is not merely incorrect because it is factually wanting but 'because it is contrary to law.' [Citation.]  When a given instruction misstates the law, the more demanding standard of *Chapman v. California* (1967) 386 U.S. 18, 24, applies, requiring reversal unless the error was harmless beyond a reasonable doubt.  "'[L]egal error requires a more stringent standard for prejudice … [because] jurors are presumed to be less able to identify and ignore an incorrect statement of law due to their lack of formal legal training. [Citation.]  Factual errors, on the other hand, are less likely to be prejudicial because jurors are generally able to evaluate the facts of a case and ignore factually inapplicable theories.'"" (*Mumin, supra*, 15 Cal.5th at p. 207.)

The *Watson/Chapman*[4] prejudice distinction turns on whether "a legally inadequate theory was conveyed to the jury" and "there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner." (*Canizales, supra*, 7 Cal.5th at pp. 613–614.) That standard is met where the *court's instructions and counsel's argument together* create a reasonable likelihood the jury convicted without finding the specific intent to kill required to convict of attempted murder. (*Ibid.*)

**b.** Analysis

Preliminarily, we note we have already found the kill zone instruction was factually unsupported in this case and that the instruction should not have been administered. We also find the additional errors, discussed *ante,* resulted in legally inadequate theories being presented to the jury and, as a result, it is reasonably likely the jury understood the kill zone instruction in a legally impermissible manner. (See *Canizales, supra*, 7 Cal.5th at pp. 613–614.) As such, we find the *Chapman* standard of prejudice applies, and, for the following reasons, reversal is required.

First, the direct contradiction between the primary target identified in the court's instruction and the People's argument left the jury without any coherent legally or factually sound framework. *Mumin* found *Chapman* applicable where the instruction and argument each independently failed to properly define the kill zone in terms of the primary target and the required intent. (*Mumin, supra*, 15 Cal.5th at p. 210.) Here, the deficiencies are even greater. Not only did each independently fail, but the two theories quite literally pointed in opposite directions making defining the bounds of the kill zone impossible.

---

[4] *Chapman v. California, supra*, 386 U.S. 18 (*Chapman*).

27

Furthermore, we find it unlikely the jury would have known how to simply disregard the faulty instruction where the People's argument added confusion to the issues.

Second, the prosecutor's proximity definition, permitted the jury to convict without finding that defendant intended to kill everyone in a defined zone of fatal harm in order to ensure his primary target's death. In applying the definition supplied by the prosecutor, the jury would have asked only whether Strickler and Solano were "close to" or in "close proximity" to the primary target, not whether the circumstances of defendant's attack were designed to kill everyone in a defined area in order to kill his primary target. This definition permits a conviction based on implied malice rather than specific intent to kill and is legally impermissible. (See *Canizales, supra*, 7 Cal.5th at p. 614.)

Third, the prosecutor's shifting kill zone argument permitted conviction based on the direction of defendant's pursuit rather than on any finding about whether his method of attack demonstrated his intent to create a zone of fatal harm. Under the People's theory, Strickler and Solano became members of a kill zone simply because defendant moved in their general direction while pursuing his target and firing his weapon. Here, too, defendant would not have needed to intend to kill the women or kill everyone in a particular zone of fatal harm.

We find the jury's questions during deliberations revealing in two respects. First, the inquiry discloses the jury was actively attempting to apply the kill zone theory and thus, respondent's argument that the jury would have simply set aside a factually wanting kill zone instruction cannot be established beyond a reasonable doubt. Second, the inquiry demonstrates the jury was wrestling with the meaning of proximity and defining the kill zone

in light of the prosecutor's arguments and the identification of two different primary targets.

Unfortunately, the court's response to the jury's questions did not clear up any confusion and may have compounded it. The court referred the jury back to part of CALCRIM No. 600, even italicizing and underscoring the portion where the wrong primary target was identified. The court's response also introduced two new wrinkles: (1) an analytical roundabout where if the jury found defendant intended to kill the named victims, the kill zone theory did not apply, yet if the jury decided the kill zone theory did apply, they needed to find defendant intended to kill the named victims *or* intended to create a kill zone; and (2) an analytical dead-end where if they decided the kill zone did not apply because defendant had the intent to kill the named victims, they were not guided where to go next to find liability for this nonshooter defendant.

Of course, a separate ground for conviction existed in the form of direct aiding and abetting. However, the record does not support finding the aiding and abetting theory was adequately presented to the jury, and we are unable to find the conviction rested on that ground.

We note that direct aiding and abetting was the only available theory to convict defendant of Villegas's murder in count 1 and the evidence and argument adequately supported such a finding. However, a similar showing was never made with regard to the attempted murders of Strickler and Solano. The prosecutor's explanation of aiding and abetting in relation to counts 3 and 4 was never fully developed, and the use of a bank robbery hypothetical where the robber and the shooter "switch roles" was unclear. Furthermore, rather than explain the application of aiding and abetting and a kill zone as two separate theories of liability, the prosecutor went back and forth between the two theories, making it

difficult to distinguish between the two or apply either theory correctly.

While discussing the bank robbery example and how each person playing different roles can be guilty of aiding and abetting even after they switch roles, without warning, the prosecutor pivoted to the kill zone and the "dynamic" nature of the kill zone in this particular case. Quickly the discussion moved back to aiding and abetting, addressing how defendant is liable as an aider and abettor on every count except Pineda, and then back, to again discussing the shifting kill zone.

Though an effort was made to address aiding and abetting by saying, "[Y]ou have these victims shot by Andrew Salas and you have the aiding and abetting theory as it relates to those other additional counts," the prosecutor switched back to kill zone by saying, "And that's where the kill zone would shift."

Returning to aiding and abetting a final time, the prosecutor explained defendant could be guilty as a direct perpetrator or as an aider and abettor like in the robbery example, "where the driver and robber can switch roles." To establish defendant's liability as an aider and abettor, the prosecutor pointed to the role defendant played in arranging and driving to the meeting with Pineda and argued defendant knew Solano was in the car and "might have known" Strickler was present—apparently an effort to establish defendant would have known Salas would kill them.

The prosecutor argued "without [defendant's] participation throughout that day, Andrew Salas could not have committed the murder or the additional attempt murders." Perhaps, but participation in the events throughout the evening, on its own, does not establish defendant knew of Salas's intent to kill Solano and Strickler or that he intended to aid and abet Salas's attempt to do so. No witness provided any evidence to infer defendant would have

known of Salas's intent to eliminate the women as witnesses. Moreover, Salas, having testified to shooting all four victims, stated he did not inform defendant of his intent to kill. Salas testified, when he learned Solano was present, before the shooting, he planned to kill her because he did not want to leave any witnesses. During the shooting, when surprised with the presence of Strickler, Salas decided to kill her for the same reason. Without evidence of defendant's knowledge of Salas's intent to kill each woman, aider and abettor liability for defendant is not established. (See CALCRIM No. 401.)

Respondent asserts that *Watson* applies because "the record [fails to] affirmatively indicate[] that [defendant's] convictions … actually rested on a kill zone theory." For the foregoing reasons, we are not persuaded and find the cumulative effect of these errors conveyed a theory that was "'contrary to law.'" (*Mumin, supra*, 15 Cal.5th at p. 207.)

Even assuming *Watson* harmless error applied, reversal is required. Under *Watson*, reversal is warranted when it is reasonably probable that a more favorable result would have been reached absent the error. (*Watson, supra*, 46 Cal.2d at p. 836.) We find the errors here satisfy even this standard. The factually unsupported kill zone instruction was built around a false factual scenario where Villegas was defendant's primary target; the People argued legally incorrect definitions of the kill zone; and the jury's questions tend to prove it absorbed them. The aiding and abetting theory with regard to Strickler and Solano was not fully developed, and the prosecutor's argument repeatedly wove kill zone principles into its explanation. Therefore, it is reasonably probable that at least one juror, properly instructed on the kill zone, would have found the theory was not satisfied on these facts and that the aiding

31

and abetting theory, as presented, would not have been a supported alternative.

## II.    Sentencing

Defendant contends the trial court abused its discretion in imposing the middle term on counts 5 and 7 because there were no aggravating factors proven.  We disagree.

Ahead of sentencing, defense counsel submitted a motion to dismiss the prior strike conviction pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 on the grounds the strike was remote.  In it, counsel did not advance any mitigating circumstances contributing to the offense.

During sentencing, the court explained in some detail the egregious facts of the offense and noted, in its assessment, the case could have been tried as a lying-in-wait special circumstances case.  The court detailed the ways the offense has affected the family of Villegas, as well as the permanent consequences to each of the surviving victims.  The court observed, during the trial, defendant presented "like a boy who was ready to go to the church choir" with his glasses and grown out hair and upon conviction, defendant "changed his appearance," having arrived to court with a shaved head "proudly displaying the tattoos of his gang … on the top of his head."  The court declined to use its discretion to strike defendant's prior strike conviction.

Relevant here, section 1170, subdivision (b)(1) provides, "When a … statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence *not to exceed the middle term* …."  (Italics added.)  Section 1170, subdivision (b)(6) provides, "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the

32

lower term if any of the following was a contributing factor in the commission of the offense." What follows is a list of mitigating circumstances for the court to consider.

Here, as noted, no mitigating circumstances were presented or argued by defense counsel. Section 1170, subdivision (b)(7) allows the court to impose the lower term even without evidence of mitigating circumstances. However, nothing in the section prevents a court from using its discretion to impose the middle term where there are no mitigating or aggravating factors to balance.

Accordingly, under section 1170, subdivision (b)(1), the court was permitted to impose the lower or middle term. As noted, when it imposed defendant's sentence, the court explained the egregious nature of the offense, the long-lasting effects on the victims, as well as defendant's apparent continued gang representation after the jury was dismissed. We find the court acted within its sound discretion in imposing the middle term pursuant to section 1170, subdivision (b)(1).

## DISPOSITION

The attempted murder convictions in counts 3 and 4 are reversed and the matter is remanded with directions to allow the People to elect whether to retry defendant on those charges without use of the kill zone theory. The judgment is affirmed in all other respects.


                                                    CHAVEZ, Acting P. J.

We concur:


RICHARDSON, J.                    GOORVITCH, J.


33